IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | Case No. 1:16-cr-64 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | Order Denying Maruyasu Industries Co., |
| | : | Ltd.'s Motion to Dismiss the Indictment |
| Maruyasu Industries Co., Ltd., *et al*., | : | for Lack of Personal Jurisdiction and |
| | : | Curtis Maruyasu America, Inc.'s Motion |
| Defendants. | : | to Transfer Venue |
| | : | |
| | : | |

This matter is before the Court on two pending Motions, Defendant Maruyasu Industries

Co., Ltd.'s Motion to Dismiss the Indictment for Lack of Personal Jurisdiction (Doc. 48) and

Defendant Curtis Maruyasu America, Inc.'s Motion to Transfer Venue (Doc. 47). Both Motions

are opposed. The Court held oral argument on these Motions on November 9, 2016, and they are

now ripe for decision.

I.      **BACKGROUND**

        **A.  FACTS**[1]

        Although the Indictment charges six Defendants, only two have appeared before this

Court – Curtis-Maruyasu America, Inc. ("CMA"), an Indiana corporation with its principal place

of business in Lebanon, Kentucky and a wholly-owned subsidiary of Maruyasu Industries, Co.,

Ltd. ("Maruyasu") and Maruyasu, a corporation organized under the laws of Japan with its

principal place of business in Aichi Prefecture in Japan. (Doc. 1 at PageID 1–2, ¶¶ 1, 2.) During

the period covered by the Indictment, CMA manufactured, supplied, and sold automotive steel

---

[1] The Court has drawn the facts herein from those alleged in the Indictment, unless otherwise
indicated.

tubes[2] to customers in the United States. (*Id.* at PageID 1, ¶ 1.) CMA conducted business from facilities in several locations, including Tracy, California and San Antonio, Texas. (*Id.*) Maruyasu, its parent company, is a global automotive parts manufacturer. (*Id.* at PageID 2, ¶ 2.) During the period covered by the Indictment, Maruyasu, by and through CMA and other known and unknown subsidiaries, manufactured and supplied automotive steel tubes in the United States and elsewhere, including at a facility in Lebanon, Kentucky operated by CMA. (*Id.*) Maruyasu, through CMA, was engaged in the sale of automotive steel tubes to vehicle manufacturers and suppliers to vehicle manufacturers in the United States and elsewhere. (*Id.*) Four other Defendants have been charged in conspiring to violate the Sherman Act, but have not appeared: Tado Hirade, Kazunori Kobayashi, Satoru Murai, and Yoshihiro Shigematsu. (*Id.* at PageID 2–3, ¶¶ 3–6.)

From July 2003 through March 2010, the exact dates being unknown, Defendant Hirade was a resident and citizen of Japan who served as Assistant General Manager of Sales Group 2 and General Manager of Sales Division 2 for Maruyasu. (*Id.* at PageID 2, ¶ 3.) In both positions, Hirade had responsibility for sales of automotive steel tubes by Maruyasu. (*Id.*) He was employed by Maruaysu until at least July 9, 2011. (*Id.*)

From 2002 through at least April 2006, the exact dates being unknown, Defendant Kobayashi was a resident and citizen of Japan who resided in the United States and served as Sales Coordinator at CMA, with responsibility for sales of automotive steel tubes to customers in the United States. (*Id.* at ¶ 4.) From at least June 2007 through at least July 2009, Kobayashi resided in Japan, where he served as General Manager of Sales Group No. 1 and then General

---

[2] Automotive steel tubes are used in fuel distribution, braking, and other automotive systems and are sometimes divided into two categories: chassis tubes and engine parts. (*Id.* at PageID 3–4, ¶ 9.) Chassis tubes, such as brake and fuel tubes, tend to be located in the body of a vehicle, whereas engine parts, such as fuel injection rails, oil level tubes, and oil strainer tubes, are associated with the function of a vehicle's engine. (*Id.*)

manager for Sales Division No. 2 for Maruyasu, with responsibility for sales of automotive steel tubes. (*Id*.) He was employed by Maruyasu until at least July 9, 2011. (*Id*.)

From at least as early as December 2001 through at least July 2011, the exact dates being unknown, Defendant Murai was a resident and citizen of Japan who served as Managing Director and then Senior Managing Director for Maruyasu with responsibility for sales of automotive steel tubes. (*Id.* at PageID 3, ¶ 5.) Murai was an employee of Maruyasu until at least July 9, 2011. (*Id*.)

From at least as early as July 2003 through December 2005, the exact dates being unknown, Defendant Shigematsu was a resident and citizen of Japan who was a Chief in Sales Group No. 1 and Sales Group No. 2 for Maruyasu and had responsibility for sales of automotive steel tubes. (*Id.* at ¶ 6.) From at least as early as May 2006 through October 2010, the exact dates being unknown, Shigematsu resided in the United States and served as Sales Coordinator at CMA, with responsibility for sales of automotive steel tubes to customers in the United States. (*Id*.) Shigematsu was an employee of Maruyasu until at least July 9, 2011. (*Id*.)

The Indictment charges Defendants and their co-conspirators with selling automotive steel tubes to customers for installation in vehicles and engines manufactured and sold in the United States and elsewhere. (*Id*. at PageID 4, ¶ 11.) Beginning at least as early as December 2003 and continuing until at least as late as July 9, 2011, in the Southern District of Ohio and elsewhere, Defendants and their co-conspirators knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to fix prices, allocate customers, and rig bids for automotive steel tubes sold in the United States and elsewhere. (*Id*. at PageID 5, ¶ 12.) The Government alleges this conspiracy was an

unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  (*Id.* at ¶ 13.)

The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix prices, allocate customers, and rig bids for automotive steel tubes sold in the United States and elsewhere.  (*Id.* at ¶ 14.)  Specifically, Defendants and their co-conspirators conspired to participate in meetings and communications in the United States and elsewhere concerning customers, bids, prices, and price adjustments for automotive steel tubes to be submitted to customers, including meetings in or around the United States, including in March 2004 near Lebanon, Kentucky, August 2004 near Detroit, Michigan, November 2005 near Lexington, Kentucky, May 2007 in Detroit, Michigan, October 2008 in Dayton, Ohio, July 2009 in Dayton, Ohio, and October 2010 in Findlay, Ohio.  (*Id.* at PageID 5–6, ¶ 14.)  Defendants and their co-conspirators exchanged information and agreed during such meetings on allocations of customers, bids, prices, and price adjustments to be submitted to customers in the United States and elsewhere.  (*Id.* at PageID 6, ¶ 14.)  They also agreed not to compete for certain customers or business for automotive steel tubes sold in the United States and elsewhere by not submitting prices or bids or by submitting collusive and noncompetitive prices or bids.  (*Id.*)  Defendants and their co-conspirators submitted, directed, and authorized the submission of collusive and noncompetitive bids, prices, and price adjustments for automotive steel tubes, and sold those steel tubes to customers in the United States and elsewhere at collusive and noncompetitive prices, accepted payment for those products, and employed measures to conceal their conduct, including avoiding the use of co-conspirators' names, meeting surreptitiously with co-

conspirators, and adopting means and methods of communication designed to avoid detection.
(*Id*. at PageID 6–7, ¶ 14.)

### B. PROCEDURAL HISTORY

On June 15, 2016, a federal grand jury in the Southern District of Ohio returned the Indictment charging the Defendants with the above-described conspiracy. (Doc. 1.) Summonses were issued on June 15, 2016 to all Defendants. (Docs. 3–8.) On June 20, 2016, counsel for Maruyasu and CMA entered their appearances. (Doc. 10–15.) On June 20, 2016, Maruyasu waived service of summons (Doc. 15), and its executed summons dated June 16, 2016 was filed with the Court.

On June 30, 2016, Maruyasu was arraigned, pleaded not guilty, and filed an appearance bond. (Docs. 27, 28, 42.) On July 12, 2016, CMA was arraigned, pleaded not guilty, and filed an appearance bond. (Doc. 39, 40, 43.) Later that day, upon request of the parties, the Court held a status conference in chambers to discuss the case and set deadlines. (Docs. 33, 35.) Although arrest warrants have been issued by Magistrate Judge Litkovitz, the four individual Defendants have yet to appear.[3] (Docs. 29–32.)

---

[3] Pursuant to 18 U.S.C. § 3161(6), time is excludable from the Speedy Trial Act clock for "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Here, the four individual Defendants have retained counsel but have not appeared before the Court. As of a status conference with the Court on July 12, 2016, counsel for CMA indicated she had been in contact with counsel for these four Defendants, but they had not decided whether to appear. All parties at that point agreed that the Speedy Trial Act clock had yet to run, but it would be up to the Court to determine a reasonable time period for the remaining Defendants to appear. The Court finds that the period from July 12, 2016, the date of arraignment of Maruyasu, until the date of the release of this Order – approximately six months – to be a sufficient and reasonable amount of time for international Defendants presumed to be located in Japan to appear before this Court. Now that this time has elapsed, however, the case must proceed to trial. Accordingly, the Speedy Trial Act clock will begin running today, upon issuance of this Order. The Court will proceed with scheduling a status conference at its earliest availability to schedule dates in this case.

On August 22, 2016, CMA filed its Motion to Transfer Venue, and Maruyasu filed its Motion to Dismiss.  (Docs. 47, 48.)  Maruyasu's Motion to Dismiss raised a variety of novel questions of law, prompting the Court to request the parties to be prepared to discuss specific research questions at the hearing on both Motions, which was held on November 9, 2016.  (Doc. 55.)

## II.    LAW

### A.  Motion to Dismiss

Defendant Maruyasu moves the Court pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure to dismiss the Indictment for lack of personal jurisdiction.  (Doc. 48.) Maruyasu's central argument is that the Indictment does not – and cannot – allege facts sufficient to establish personal jurisdiction over Maruyasu in this Court or in any other United States district court.  Maruyasu argues that before exercising personal jurisdiction over a non-resident defendant, a district court must find that the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citing *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

Pursuant to Rule 12(b)(2), "[a] motion that the court lacks jurisdiction may be made at any time while the case is pending."  Maruyasu moves to dismiss the case for lack of *personal* jurisdiction, but "jurisdiction" has been interpreted under Fed. R. Cr. P. 12(b)(2) to refer to *subject matter* jurisdiction.  2 Mark S. Rhodes, Orfield's Criminal Procedure Under the Federal Rules, § 12:102 (2d ed. 2016) ("The words 'lack of jurisdiction' in Rule 12(b)(2) refer to jurisdiction of the subject matter.");  *see also U.S. v. Grote*, 632 F.2d 387, 388–89 (5th Cir. 1980) (distinguishing between objections to personal jurisdiction, which require an objection based on

the prosecution be raised prior to trial and failure to do so results in a waiver, with objections to lack of subject matter jurisdiction, which cannot be waived and may be raised at any time.) Although the Court will hear the substance of Maruyasu's Motion, Rule 12(b)(2) is not the proper vehicle through which to raise an objection to personal jurisdiction.

Arguably, Rule 12(b)(1) or Rule 12(b)(3) would apply to Maruyasu's Motion.  Rule 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Alternatively, under Rule 12(b)(3), a defendant must raise certain defenses and objections prior to trial, including "a defect in the indictment or information, including . . . (B)(iii) lack of specificity[.]"  Pursuant to Rule 7(c),

> The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government.  It need not contain a formal introduction or conclusion.  A count may incorporate by reference an allegation made in another count.  A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

Fed. R. Cr. P. 7(c)(1).  The Sixth Circuit has held that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The question the Court will consider below is whether an Indictment must allege facts demonstrating the basis for *in personam* jurisdiction, or facts that would satisfy the "minimum contacts" test enunciated in *International Shoe*, 326 U.S. at 316, as Maruyasu contends.

**B. Motion to Transfer Venue**

Also pending before the Court is CMA's Motion to Transfer Venue to the District Court for the Western District of Kentucky in Louisville.  (Doc. 47.)  Under Fed. R. Crim. P. 21(b), "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  The Supreme Court has set forth ten factors to be considered in making such a determination:

> (1) The location of the Defendant;
> (2) Location of the possible witnesses;
> (3) Location of events likely to be in issue;
> (4) Location of documents and records likely to be involved;
> (5) Disruption to the Defendant's business if the case is not transferred;
> (6) Expense to the parties;
> (7) Location of counsel;
> (8) Relative accessibility of the place of trial;
> (9) Docket conditions of each district or division involved; and
> (10) Any other special elements which might affect the transfer.

*Platt v. Minnesota Mining & Mfg. Co*., 376 U.S. 240, 243–44 (1964); *United States v. Micciche*, 165 Fed. App'x 379, 385 (6th Cir. 2006); *United States v. Miller*, 314 F.R.D. 574, 577 (S.D. Ohio 2016).  "Rule 21(b) is not intended to provide a mechanism for forum shopping by defendants and, further, 'require[s] that a transfer for convenience satisfy the convenience of *both* parties.'"  *Miller*, 314 F.R.D. at 576 (citing *United States v. Jamal*, 246 Fed. App'x 351, 369 (6th Cir. 2007) (emphasis in original)).  The burden is on the defendant to show that a transfer would serve the purposes set forth in Rule 21(b).  *United States v. Tripp*, No. 91-5129, 91-5130, 946 F.2d 896 (Table), 1991 WL 203756, at *5 (6th Cir. Oct. 7, 1991).   The decision to transfer rests within the discretion of the trial judge.  *United States v. Collins*, No. 91-5215, 955 F.2d 45 (Table), 1992 WL 31302, at *4 (Feb. 20, 1992).

### III.    ANALYSIS

#### A.  Motion to Dismiss

##### 1.   Dispute Over Whether Minimum Contacts Applies in Criminal Prosecution

The Court will consider first Maruyasu's Motion to Dismiss the Indictment for Lack of Personal Jurisdiction.  (Doc. 48.)  The Court will begin by summarizing the parties' arguments. Following this, the Court will engage in its own analysis, ultimately finding the Motion should be denied.

The parties vigorously dispute whether the Court has personal jurisdiction over Maruyasu.  Maruyasu argues that the Indictment fails to allege facts to support that Maruyasu – a company headquartered in Japan – has minimum contacts with the forum of the Southern District of Ohio, or any United States district court.[4]  Its position is that due process requires that before exercising personal jurisdiction over a non-resident defendant like itself, a district court must find that the defendant has minimum contacts with the forum state so as not to offend notions of fair play and substantial justice – the jurisdictional test typically applied in *civil* cases.  *See Int'l Shoe*, 326 U.S. at 316.  Maruyasu has identified a handful of cases it contends support the position that the minimum contacts test applies equally in civil *and* criminal matters.[5]  *See In re Sealed Case*, 832 F.2d 1268, 1273–74 (D.C. Cir. 1987), *abrogated on other grounds*, *Braswell v. United States*, 487 U.S. 99 (1988); *Matter of Marc Rich & Co. v. United States*, 707 F.2d 663, 667 (2nd Cir. 1983); *United States v. Nippon Paper Indus. Co.*, 944 F. Supp. 55, 59 (D. Mass. 1996), *rev'd on other grounds*, 101 F.3d 1 (1st Cir. 1997); *United States v. Chitron Elecs. Co.*,

---

[4] Maruyasu supports its Motion with the Declaration of Mikio Iwatsuki, the Operating Officer in the Human Resources Department for Maruyasu, who attests to facts relating to Maruyasu's business activities in Japan and the United States.  (Doc. 48-2 at PageID 334–36.)

[5] Both Maruyasu and the Government concede that there is no Sixth Circuit law on the novel question presented by Maruyasu's Motion to Dismiss.  (Transcript, Doc. 58 at PageID 441, 457.)

668 F. Supp. 2d 298, 303–04 (D. Mass. 2009). In addition, Maruyasu argues that "[t]he [Antitrust] Division itself has long recognized the applicability of the minimum-contacts test and personal jurisdiction under these circumstances."[6] (Doc. 52 at PageID 391.)

Given Maruyasu's novel argument, the Court finds it necessary to provide some context for the personal jurisdiction analysis applied in a *civil* case. "The Due Process Clause of the Fourteenth Amendment operates as a limitation on the jurisdiction of state courts to enter judgments affecting rights or interests of nonresident defendants." *Kulko v. Cal. Superior Court*, 436 U.S. 84, 91 (1978). Dating back to *Pennoyer v. Neff*, 95 U.S. 714, 732–33 (1878), "[i]t has long been the rule that a valid judgment imposing a personal obligation or duty in favor of the plaintiff may be entered only by a court having jurisdiction over the person of the defendant." *Id.* Thus, "the existence of personal jurisdiction . . . depends upon the presence of reasonable notice to the defendant that an action has been brought and sufficient connection between the defendant and forum state to make it fair to require defense of the action in the forum." *Id.* (internal citations removed).

The constitutional standard for determining whether a state may enter a binding judgment against a defendant is set forth in *International Shoe*: a defendant must have minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Kalko,* 436 U.S. at 92 (citing *Int'l Shoe*, 326 U.S. at 316.)

---

[6] In support of this position, Maruyasu relies upon a Department of Justice and Federal Trade Commission Guideline and speeches by Antitrust Division employees. *See* Department of Justice and Federal Trade Commission, "Guidelines for International Operations" at § 2.1, Illustrative Example A54, § 4.1; Gary R. Spratling, Criminal Deputy Assistant Att'y Gen., Antitrust Div., Speech at the Advanced Criminal Antitrust Workshop: Criminal Antitrust Enforcement Against International Cartels at 9-10 (Feb. 21, 1997); Anne K. Bingaman, Assistant Att'y Gen., Antitrust Div., Address Before the Japan Society: The Role of Antitrust in International Trade (Mar. 3, 1994) (available at: https://www.justice.gov/atr/speech/role-antitrust-international-trade). These authorities are non-binding and appear to be taken out of context. Citation to case law on the issue would have been more helpful.

"The concept of minimum contacts" serves a two-fold purpose: "[i]t protects the defendant against the burdens of litigating in a distant or inconvenient forum" and "it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Under *International Shoe* and its progeny, to establish personal jurisdiction, a plaintiff must show that (1) the defendant had minimum contacts with the forum state such that the defendant "should reasonably anticipate being haled into court there," *Volkswagen,* 444 U.S. at 297, and (2) that the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice," *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.,* 91 F.3d 790, 793 (6th Cir.1996) (citing *Int'l Shoe*, 326 U.S. at 316).

A defendant's contacts with the forum state can give rise to either general or specific jurisdiction. *Fortis Corp. Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 218 (6th Cir. 2006). "General jurisdiction is established when a defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims." *Id.* (internal quotation and citation omitted). "Specific jurisdiction subjects a defendant to suit in the forum state only on claims that arise out of or relate to a defendant's contacts with the forum." *Id.* (internal quotation and citation omitted). Courts in the Sixth Circuit follow a three-prong test to determine whether specific personal jurisdiction exists: (1) the defendant must purposefully avail itself to the privilege of acting in the forum or causing a consequence in the forum; (2) the cause of action must arise from the defendant's activities there; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 450 (6th Cir. 2012) (citing *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Maruyasu argues that the facts in the Indictment fail to demonstrate the existence of either general or specific jurisdiction. General jurisdiction is not met, it argues, because its contacts with the United States are not so continuous and systematic so as to render it "at home" in the forum. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 749–50 (2014). Nor is specific jurisdiction met, because Maruyasu did not purposefully avail itself to the forum, the Sherman Act violation does not arise from Maruyasu's United States contacts, and exercising jurisdiction over Maruyasu would be unreasonable.

The Government argues that the Due Process Clause does not impose identical requirements in the civil and criminal contexts. Rather, in a criminal prosecution, "due process of law is satisfied when one present in court is convicted of [a] crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional safeguards." *Frisbie v. Collins*, 342 U.S. 519, 522 (1952). Nothing more, including meeting the minimum contacts test, is required. That is, a "federal district court has personal jurisdiction to try any defendant brought before it on a federal indictment charging a violation of federal law." *United States v. Rendon*, 354 F.3d 1320, 1326 (11th Cir. 2003). The Government argues that Maruyasu has appeared in this court, pleaded not guilty, and participated in this action; thus, the Court has personal jurisdiction over it. Alternatively, the Government argues that even if the civil due process standard applies in criminal cases, the Indictment alleges enough to establish that specific jurisdiction over Maruyasu exists.

### 2. The Minimum Contacts Test Does Not Apply

Having presented the parties' competing positions, the Court will turn to its own analysis of whether the minimum contacts test applies to the question of whether it has personal jurisdiction over Maruyasu.

As was discussed at the hearing, a small number of courts, and no Sixth Circuit panel, have examined the question of whether the minimum contacts test applies in a criminal prosecution. The body of law on this issue appears to be limited to four cases. *See In re Sealed Case*, 832 F.2d 1268, 1273–74 (D.C. Cir. 1987), *abrogated on other grounds*, *Braswell v. United States*, 487 U.S. 99 (1988); *Matter of Marc Rich & Co. v. United States*, 707 F.2d 663, 667 (2nd Cir. 1983); *United States v. Nippon Paper Indus. Co.*, 944 F. Supp. 55, 59 (D. Mass. 1996), *rev'd on other grounds*, 101 F.3d 1 (1st Cir. 1997); *United States v. Chitron Elecs. Co*., 668 F. Supp. 2d 298, 303–04 (D. Mass. 2009). Maruyasu contends that these cases support its position that the minimum contacts test is appropriately applied in determining whether the district court has personal jurisdiction over a non-resident, foreign defendant. Having carefully considered the cases that have examined this issue, the Court finds each is either distinguishable or an outlier.

Two cases involve the enforcement of subpoenas, and are distinguishable on that basis alone. *See In re Sealed Case*, 832 F.2d at 1273–74; *Matter of Marc Rich*, 707 F.2d at 667. *In re Sealed Case* involved service of a subpoena duces tecum upon a witness in custodial capacity with foreign companies. 832 F.2d at 1273–74. The First Circuit reversed and remanded the district court's decision, holding that a court only has jurisdiction to issue an order compelling production of subpoenaed documents if it has personal jurisdiction over the collective entity whose alleged custodian was served. *Id*. at 1284. For that inquiry, the district court should look at whether the entity has minimum contacts with the United States. *Id*. at 1274. *Matter of Marc*

*Rich* involved an appeal by a foreign corporation from an order holding it in contempt for failing to comply with a grand jury subpoena duces tecum and imposing sanctions to compel compliance.  707 F.2d at 665.  The Second Circuit noted that the district court should look to the witness's contacts with the United States in determining whether it had personal jurisdiction over the witness subpoenaed.  *Id*. at 667.

The two remaining cases are outliers – both from the District of Massachusetts – and the Court here is not persuaded to follow them.  In *Nippon Paper*, the United States brought a criminal action against a Japanese corporation, alleging that its predecessor had conspired to fix prices on paper sold in the United States in violation of the Sherman Act.  944 F. Supp. at 58.  In ruling on a motion to dismiss, the court applied the minimum contacts test and concluded that the corporation had engaged in continuous and systemic activity in the United States, thus giving the court general personal jurisdiction over it.[7]  *Id*. at 62.  In *Chitron,* an electronics corporation was charged with illegally exporting defense articles and technology controlled by the Department of Commerce from the United States to the People's Republic of China.  668 F. Supp. 2d at 299.  The corporation moved to dismiss the indictment, alleging, like Maruyasu, that the court lacked personal jurisdiction over it.  *Id*. at 300, 302.  Citing *In re Sealed Case* and *Matter of Marc Rich & Co.*, the district court acknowledged that "[t]he case law discussing the specific issue of personal jurisdiction over foreign corporations in the criminal context is surprisingly sparse and poorly developed."  *Id*. at 302–03.  Without articulating why it applied the minimum contacts test, the district court did so – finding the government did provide sufficient evidence that the

---

[7] However, the district court nevertheless dismissed the Indictment against the corporation and its predecessor in reaching a conclusion that the criminal provisions of the Sherman Act did not apply to conspiratorial conduct in which none of the overt acts of the conspiracy took place in the United States.  *Id*. at 66.  The basis for that dismissal was appealed and reversed by the First Circuit Court of Appeals.  109 F.3d at 9 (reinstating the Indictment and remanding the case for further proceedings).

corporation engaged in activities in the United States sufficient to meet the "minimum contacts" and "effects" test such that the court could properly exercise personal jurisdiction over the defendant. *Id.* at 304. The Court here is most interested in *why* and *whether* the minimum contacts test is properly applied to determine whether personal jurisdiction exists over a criminal defendant. It is not convinced that *Nippon Paper* or *Chitron* adequately address this concern, and so it does not find these authorities particularly persuasive in helping it reach its own conclusion.

Rather, the Court finds compelling the Government's position that due process in the civil and criminal contexts simply is *different*. For instance, in a civil action, a court cannot exercise personal jurisdiction over a party who is induced by artifice or fraud to come within the jurisdiction. *Commercial Mut. Accident Co. v. Davis*, 213 U.S. 245, 256 (1909). By contrast, in a criminal prosecution, "[i]t is well settled that a district court has personal jurisdiction over any party who appears before it, regardless of how his appearance was obtained." *United States v. Lussier*, 929 F.2d 25, 27 (1st Cir. 1991). For example, forcible abduction does not prohibit a defendant's trial in a court in the United States for violation of criminal laws. *United States v. Alvarez-Machain*, 504 U.S. 655, 670 (1992).

This Court, therefore, will apply the long-held standard that due process "is satisfied when one present in court is convicted of [a] crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional safeguards." *Frisbie*, 342 U.S. at 522. A "federal district court has personal jurisdiction to try any defendant brought before it on federal indictment charging violation of federal law." *Rendon*, 354 F.3d at 1326. Thus, the question becomes whether Maruyasu appeared in this case. In reviewing the procedural history, the Court concludes in the affirmative. Maruyasu was indicted by the grand

jury on June 15, 2016.  (Doc. 1.)  On June 20, 2016, counsel for Maruyasu filed its appearance.[8]

(Doc. 15.)  On June 30, 2016, Maruyasu was arraigned, pleaded not guilty, and filed an

appearance bond.  (Docs. 27, 28, 42.)  On July 12, 2016, Maruyasu, upon a joint request by it

and CMA, participated in a status conference in chambers to discuss the case and set deadlines.

(Docs. 33, 35.)  Maruyasu also joined in a motion for protective order governing discovery

provided by the United States.  (Doc. 37.)  Thus, the procedural history demonstrates that

Maruyasu has appeared before this Court and submitted to its jurisdiction.  *Pon v. United States,*

168 F.2d 373, 374 (1948) ("While the competency of any court to adjudicate the subject matter

may always be questioned, jurisdiction of the person, if not challenged upon appearance, is

equivalent to consent." *Chapman v. Scott*, 10 F.2d 156, 159 (D. Conn. 1925), *aff'd*, 10 F.2d 690

(2d Cir. 1926).)

Maruyasu argues that it filed not an appearance, but a "Special Appearance," reserving its

right to question personal jurisdiction of this Court.  (*See* Doc. 15.)  Maruyasu argues the

impetus for its "Special Appearance" is *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011).

In *Gerber*, the Sixth Circuit assessed whether defendants in a *civil* case waived their personal

jurisdiction defense through appearances and filings in the district court.  The Sixth Circuit found

that the defendants waived their personal jurisdiction defense when their attorney entered a

general appearance with the district court.  *Id*. at 519–20.  The Sixth Circuit found that under

Fed. R. Civ. P. 12(h), a party waives the right to contest personal jurisdiction by failing to raise

the issue when making a responsive pleading or a general appearance.  *Id*. at 520.  In response to

Maruyasu's *Gerber* argument, the Government argues that the Federal Rules of *Criminal*

---

[8] Counsel filed what it self-designated as a Notice of "Special Appearance" and stated that "[t]hrough this special appearance, Maruyasu waives service of a summons and indictment but expressly reserves all other rights, privileges, immunities and defenses, including but not limited to the defenses of lack of personal jurisdiction as well as improper and inconvenient venue." (Doc. 15 at PageID 88.)

Procedure do not allow for a "Special Appearance," and that by appearing and participating in this case, Maruyasu waived its right to challenge personal jurisdiction.

Although the Court does not recall encountering a "Special Appearance" in a criminal case before, it is not satisfied that it may make a distinction between a general appearance and a "Special Appearance" in this case. *See Fletcher v. United States*, 174 F.2d 373, 376 (4th Cir. 1949) (defendant in a criminal proceeding could not question the court's jurisdiction over his person when he was personally present in court by calling his appearance a "Special Appearance"); *United States v. Stein*, 435 F. Supp. 2d 330, 378 n. 235 (S.D.N.Y. 2006) (noting the Federal Rules of Civil Procedure abolish the distinction between general and specific appearances, but that those rules do not apply in a criminal case). In any event, Maruyasu's participation in the litigation – including pleading not guilty, filing an appearance bond, participating in discovery, and participating in a status conference with this Court – further cut against any conclusion that its appearance in this Court is for the sole purpose of contesting personal jurisdiction. Although Defendant argues that "Special Appearances" have been permitted by other courts, the Court notes that the cases Maruyasu cites involve a *request* by a party to seek leave for counsel to do so and for the limited purpose of moving to dismiss or contesting personal jurisdiction. *See United States v. Kolon Indus., Inc*., 926 F. Supp. 2d 794, 797–98 (E.D. Va. 2013); *United States v. Tucor Int'l, Inc*., 35 F. Supp. 2d 1172, 1176 (N.D. Cal. 1998); *United States of America v. Siriwan*, No. CR 09-81-GW, 2011 WL 13057709 (C.D. Cal. July 28, 2011). Maruyasu also argues that the *Nippon* and *Chitron* cases involved a special appearance without leave of court to challenge personal jurisdiction. (Doc. 52 at PageID 408.) Even so, the Court finds that Maruyasu's participation in the litigation *beyond an appearance* for purposes other than contesting jurisdiction undermines its argument. Thus, the Court agrees with

the Government that by appearing *and* participating in the litigation, Maruyasu has consented to the Court's personal jurisdiction over it.

For these reasons, the Court is satisfied that it has personal jurisdiction over Defendant Maruyasu.

### 3. Even if the Minimum Contacts Test Applies, the Indictment Alleges Sufficient Facts to Support the Existence of Personal Jurisdiction Over Maruyasu

While the Court is persuaded the minimum contacts test does not apply in the context of a criminal prosecution, even if it did apply, the Indictment establishes that Maruyasu has minimum contacts with the United States. The Court will turn its attention to whether the facts alleged in the Indictment support the existence of specific jurisdiction.[9] Courts in the Sixth Circuit follow a three-prong test to determine whether specific personal jurisdiction exists: (1) the defendant must purposefully avail itself to the privilege of acting in the forum or causing a consequence in the forum; (2) the cause of action must arise from the defendant's activities there; and (3) the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable. *Carrier Corp.*, 673 F.3d at 450.

### a. Maruyasu Purposefully Availed Itself to the United States

Maruyasu asserts several arguments in support of its position that the Indictment falls short of articulating facts that demonstrate that Maruyasu – as opposed to CMA – purposefully availed itself to the United States. First, the Indictment does not allege contacts by Maruyasu that establish purposeful availment. The Indictment only mentions Maruyasu by name in six

---

[9] The Court focuses its analysis on the existence of *specific* personal jurisdiction, because there is no dispute that *general* personal jurisdiction is not met here. (*See* Doc. 52 at PageID 398); *Buckey Res., Inc. v. Duratech Indus. Int'l, Inc.*, No. 3:11-cv-335, 2011 WL 5190787, at *5 (S.D. Ohio Oct. 31, 2011) (by failing to address arguments in its memorandum in opposition to a motion for summary judgment, a party impliedly concedes the issue).

paragraphs, Doc. 1 at PageID 1–3, ¶¶ 1–6, and two paragraphs rely upon the parent-subsidiary relationship between Maruyasu and CMA, *id*. at PageID 1–2, ¶¶ 1–2. Maruyasu, unlike CMA, does not manufacturer or sell steel tubes in the United States. (Iwatsuki Decl., Doc. 48-2 at PageID 334, ¶¶ 9, 10, 13.) The remaining four paragraphs plead allegations that four individual defendants were employed by Maruyasu in Japan, but do not allege those individuals did anything specifically in the United States. (Doc. 1 at PageID 2–3, ¶¶ 3–6.)

Second, the "Means and Methods" of the alleged conspiracy vaguely lump all Defendants together, without attributing conduct to any particular party. (Doc. 1 at PageID 5–7, ¶ 14.) Third, the Indictment alleges that Defendants and co-conspirators sold products outside the United States, but selling into the stream-of-commerce is not a purposeful act directed at the United State sufficient to establish jurisdiction. *See Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 479–80 (6th Cir. 2003). Maruyasu argues that the Supreme Court has made it clear that it must be the *Defendant*, *not third parties*, who create their contacts with the forum state. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121–22 (2014). The conduct of CMA may not be considered in determining whether Maruyasu purposefully availed itself of the privileges and protections of the United States by "causing a consequence" in the forum. Fourth, the Government cannot establish that specific jurisdiction exists over Maruyasu based on the alleged conduct of its co-conspirators, because the Sixth Circuit has not adopted a co-conspirator theory of personal jurisdiction and because such a finding would run afoul of *Walden*. *See* 134 S. Ct. at 1121–22.[10]

---

[10] Further, the Southern District of Indiana recently expressed that "recent case law reveals a strong trend that something more than an attenuated link is necessary to establish a defendant's personal jurisdiction[,]" citing the *Walden* decision. *Martin v. Eide Bailly LLP*, No. 1:15-cv-1202-WTL-DKL, 2016 WL 4496570, at *3 (S.D. Ind. Aug. 26, 2016).

The Government argues that Maruyasu purposefully availed itself to the forum by conspiring to restrain United States commerce by fixing prices, allocating customers, and rigging bids for automotive steel tubes sold in the United States. (*See* Doc. 1 at PageID 4–7, ¶¶ 11–16); *see Perry v. Kempton*, 864 F. Supp. 37, 39 (S.D. Ohio 1994) (finding out-of-state defendant purposefully availed himself to Ohio law when he allegedly conspired with Ohio residents to defraud the plaintiff).[11] The Government urges the Court to adopt the conspiracy theory of jurisdiction, arguing that Maruyasu purposefully availed itself to the United States by conspiring with others who committed foreseeable acts in the United States to advance the conspiracy. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.,* 410 F. Supp. 2d 592, 599–600 (E.D. Ky. 2006) (recognizing conspiracy theory of jurisdiction and finding allegations in the complaint sufficient to establish jurisdiction).

Although the Sixth Circuit has not adopted or declined to adopt the conspiracy theory of jurisdiction, the Government argues that it would be persuaded to do so by the other courts of appeals who have found that the conspiracy theory of jurisdiction comports with due process. *See Unspam Tech., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013); *Melea, Ltd. v. Jawer SA*, 511 F3d 1060, 1069 (10th Cir. 2007); *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 523–24 (D.C. Cir. 2001); *Textor v. Bd. of Regents of N. Illinois Univ*., 711 F.2d 1387, 1392–93 (7th Cir. 1983); *but see Hollar v. Philip Morris, Inc*., 43 F. Supp. 2d 794, 802 n.7 (N.D. Ohio 1998) (declining to apply the conspiracy theory of jurisdiction); *In re Auto. Parts Litig.*, Nos. 2:13-cv-02502, 2:13-cv-02503, 2015 WL 4508938, at *4 (E.D. Mich. July 24, 2015)

---

[11] The Government implies that *Perry* was overruled by *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011) (plurality). The Court is persuaded by the Government's argument at the hearing on this matter that *J. McIntyre*, as a plurality opinion, did not overrule *Perry*. It is also persuaded by the Government's argument that the two types of foreseeability at issue in the cases are different – *Perry* involved fraud, whereas *J. McIntyre* involved stream of commerce. (*See* Doc. 58 at PageID 464–66.)

(declining to apply the conspiracy theory of personal jurisdiction absent an explicit directive by the Sixth Circuit to do so). The Indictment alleges several foreseeable acts in the United States that advanced the conspiracy, including participating in meetings in the United States and elsewhere, exchanging information and agreeing during such meetings to fix prices and not compete for customers, selling automotive steel tubes to customers in the United States and elsewhere at collusive prices, accepting payments for the same, and employing measures to conceal this conduct. (*Id.* at PageID 4–8, ¶ 11–14.)

Although the Court recognizes the concerns articulated recently by the Southern District of Indiana in *Martin*, it is nevertheless persuaded that co-conspirator conduct may be considered in assessing Maruyasu's contacts with the forum and that *Walden* does not preclude such a finding. 2016 WL 4496570, at *3. Even if it applies the minimum contacts test, the Court finds it necessary to recognize the unique circumstance of its personal jurisdiction analysis in the framework of a criminal prosecution, which is different than a civil case. As such, it is influenced by the relevance of the *Pinkerton* doctrine, which "permits the conviction of a conspirator for the substantive offense of other coconspirators committed during and in furtherance of the conspiracy." *United States v. Christian*, 942 F.2d 363, 367 (6th Cir. 1991) (finding gun possession foreseeable where conspirators' car contained $60,000), *abrogated on other grounds, Bailey v. United States*, 516 U.S. 137 (1995)) (citing *United States v. Martin*, 920 F.2d 345, 348 (6th Cir. 1990), *cert. denied*, 500 U.S. 926 (1991)). The doctrine "exists to punish conspirators for crimes committed by a coconspirator that are *not* the object of the conspiracy itself but are foreseeable and in furtherance of the conspiracy." *Id.* (emphasis in original). Of course the Court recognizes the obvious differences between liability and personal jurisdiction analysis, but nonetheless finds the underlying *Pinkerton* principle relevant here.

As such, the Court is satisfied that the facts pled in the Indictment establish that Maruyasu purposefully availed itself to the United States by knowingly joining a conspiracy to violate the Sherman Act, which included participating in meetings in the United States and elsewhere, exchanging information and agreeing during such meetings to fix prices and not compete for customers, selling automotive steel tubes to customers in the United States and elsewhere at collusive prices, accepting payments for the same, and employing measures to conceal this conduct.  (*Id.* at PageID 4–8, ¶¶ 11–14.)  Accordingly, the first prong of the minimum contacts test is met.[12]

### b.  Prosecution Arises From Contacts

Maruyasu argues that its prosecution does not arise from its activities in the forum, because its actions occurred outside of the United States.  Because Maruyasu does not manufacture or sell steel automotive tubes in the United States, the claims in the Indictment cannot arise from Maruyasu's sales and marketing activities there.  The Government responds that the charge in the Indictment is related to Maruyasu's contacts with the United States, because those contacts are the joining, participating in, and carrying out the charged conspiracy with co-conspirators in the United States.  The Court agrees with the Government's position and finds that the prosecution arises from Maruyasu's participation in the conspiracy with its co-conspirators.  Thus, this prong, too, is satisfied.

### c.  Exercising Jurisdiction Is Not Unreasonable

Finally, the parties dispute whether the third prong of the jurisdictional test is met, or whether exercising jurisdiction over Maruyasu would be unreasonable.  Maruyasu argues that the exercise of jurisdiction would be unreasonable given its minimal contacts with the United States.

---

[12] The Court need not consider the Government's argument that facts not pled in the Indictment or submitted to the Court through Affidavit also support the existence of personal jurisdiction. (*See* Doc. 50 at PageID 374.)

It also argues that Maruyasu would suffer a significant and unjustifiable burden of being forced to defend itself in the United States, given that substantial evidence, witnesses, and employees with relevant knowledge are in Japan.  The Government argues that the Defendant stands accused of violating a United States criminal felony statute, the purpose of which is to punish violators and deter future felonious conduct.  Such deterrence is not a minimal interest of the United States.  In addition, the Government persuasively argues that the application of this third prong of the jurisdictional test demonstrates its incongruence with criminal prosecutions.  Normally, this factor applies by balancing the conveniences of the parties.  Criminal prosecutions, however, are not portable: this action cannot be prosecuted in Japan.   For that reason alone, the Government's interest in prosecution this action should trump any inconvenience to Maruyasu for having to defend itself here.

The Court agrees with the Government's position and finds that exercising jurisdiction over Maruyasu is not unreasonable.  Here, the third prong is also met.

For these reasons, the Court concludes that it has personal jurisdiction over Defendant Maruyasu.  Accordingly, Maruyasu's Motion to Dismiss the Indictment for Lack of Personal Jurisdiction is **DENIED**.

## B.  Motion to Transfer Venue

The Court now turns to CMA's Motion to Transfer Venue to the Western District of Kentucky, Louisville Division.  (Doc. 47.)  The parties dispute whether the ten factors[13] a district

---

[13] To refresh the reader's memory, those ten factors are:

    (1) The location of the Defendant;
    (2) Location of the possible witnesses;
    (3) Location of events likely to be in issue;
    (4) Location of documents and records likely to be involved;
    (5) Disruption to the Defendant's business if the case is not transferred;
    (6) Expense to the parties;

court should consider in ruling on the Motion to Transfer Venue favor transfer to the Western District of Kentucky. *See Platt*, 376 U.S. at 243–44. The dispute is straightforward: CMA argues the factors favor transfer, while the Government argues they do not.[14] The Court will now consider the *Platt* factors in turn. Ultimately, it finds that transfer to Kentucky is not warranted, and CMA's Motion should be denied.

### 1. Location of the Defendant

CMA argues that because its headquarters are located in Lebanon, Kentucky – as opposed to Cincinnati, Ohio – the Western District of Kentucky is the most appropriate venue for this action. CMA's largest facility is located in Lebanon, Kentucky, where approximately ninety percent of its workforce is located. (Vyverberg Aff., Doc. 47-2 at PageID 302, ¶¶ 4, 7.) It also has manufacturing facilities in San Antonio, Texas and Santa Claus, Indiana. (*Id*. at ¶ 8.) CMA dose not operate offices or manufacturing facilities in the Southern District of Ohio. (*Id*. at ¶ 9.)

The Government argues that CMA's lack of headquarters in the Southern District of Ohio do not render this venue unfavorable. The distance between CMA's headquarters to the proposed transfer location of Louisville as opposed to Cincinnati is negligible and does not favor transfer. The federal courthouse in Louisville is approximately 70 miles away from CMA's Lebanon headquarters, while the federal courthouse in Cincinnati is approximately 145 miles CMA's Lebanon headquarters. Both are drivable distances easily accessible to CMA. *See United States v. Collins*, No. 91-5215, 955 F.2d 45 (Table), 1992 WL 31302, at *4 (6th Cir. Feb.

---

(7) Location of counsel;
(8) Relative accessibility of the place of trial;
(9) Docket conditions of each district or division involved; and
(10) Any other special elements which might affect the transfer.

*Platt*, 376 U.S. at 243–44.

[14] CMA also supports its Motion with the Affidavit of Doug Vyverberg, the President of CMA. (Doc. 47-2.)

24

20, 1992) (per curiam) (upholding district court's decision to deny transfer when the two cities were two hours apart and easily accessible to the defendant).

The Court agrees with the Government.  The overall distance of an additional 70-80 miles is negligible.  The location of CMA headquarters thus does not favor transfer to Kentucky.

### 2.  Location of Possible Witnesses

CMA argues that a substantial number of witnesses for both the Government and defense live in Kentucky, rendering Kentucky a more appropriate venue.  The Government counters that several potential Government witnesses are located in the Southern District of Ohio, including Honda.   The Government also has received help from the FBI Cincinnati Office and an FBI case agent in Cincinnati, who may testify.  Furthermore, because the case involves an international conspiracy, co-conspirators include Japanese companies and United States affiliates with principle places of business in the Eastern District of Michigan and Northern District of Ohio, both of which are closer to Cincinnati than Louisville.

In sum, the large number of witnesses and international nature of the prosecution renders any location convenient to some witnesses and inconvenient to others.  This factor, then, does not weigh in favor of transfer.

### 3.  Location of Events Likely to be in Issue

CMA argues that the Indictment centers around allegations that it entered into agreements to violate anti-trust laws.  Because its company leadership is located in Lebanon, Kentucky, the central events of the case would have occurred in Lebanon, Kentucky.  (Vyverberg Aff., Doc. 48-2 at PageID 302, ¶4–5.)  Few central events would have occurred in the Southern District of Ohio.  The Indictment alleges that for six years, CMA participated in anticompetitive conduct, but only two meetings allegedly are tied to the Southern District of Ohio.

The Government contends that CMA's argument that Lebanon, Kentucky was the nerve center of the conspiracy focuses only on its own conduct and ignores the involvement of co-conspirators and victims.  The conspiracy was implemented in Japan and at locations throughout the United States, including in the Southern District of Ohio.  Further, some alleged victims are located in the Southern District of Ohio.  In short, Lebanon was only *one* of many locations where co-conspirators carried out their conduct.

The Court acknowledges that more relevant events likely occurred in Kentucky as opposed to Ohio.  However, it agrees with the Government that the conduct of all alleged conspirators must be considered in determining the location of events likely to be at issue.  The Indictment alleges meetings occurred in various locations, including in the Southern District of Ohio.  Given this, the location of the events at issue is not limited to Lebanon.  Accordingly, this factor also does not favor transfer.

### 4.  Location of Documents and Records Likely to be Involved

CMA asserts its records are largely located in Lebanon, but modern e-discovery has eased the burden of transport.  Accordingly, because of advances in technology, this factor neither favors nor disfavors transfer.

### 5.  Disruption to Defendant's Business

CMA argues that a trial in Cincinnati would be significantly burdensome.  It asserts that CMA's executive team would be required to secure extended overnight lodging in Cincinnati and meaningful involvement in the day-to-day goings on of the company would be inhibited during the course of trial.  The Government, on the other hand, argues that a trial in Cincinnati would not be more disruptive than a trial in Louisville.

The Court finds that a trial in either Louisville or Cincinnati will be disruptive to CMA's business.  This is not a case in which a meaningful distance between the original venue and proposed new venue exists and would cause a significant *additional* burden, as was the case in *United States v. Miller*, 314 F.R.D. 574, 578 (S.D. Ohio 2016) (transferring case from Ohio to California, and finding it would be a disruption of the defendants' business if the case was not transferred to California, where the defendants all lived and worked).  The Court is not persuaded that the additional distance will render a Cincinnati trial any more disruptive than one in Louisville.  Thus, this factor does not favor transfer.

### 6.  Expense to the Parties

CMA argues the costs of defending this action will be greater in Cincinnati as opposed to in Kentucky. More travel will be required as well as extended overnight lodging.  The Government concedes that the costs for CMA to defend itself in the Southern District of Ohio may be marginally more for CMA than a trial in Louisville because the travel distance is greater, but it maintains that the marginal increased expense still does not favor transfer.

The Court agrees with the Government.  Although a trial in Cincinnati will require slightly greater driving distance, and thus more expense in gas, the Court would anticipate that overnight lodging would likely be required in Louisville *or* Cincinnati.[15]  In either city, a trial will be disruptive and an additional expense for CMA.  Thus, this factor does not weigh in favor of transfer.

### 7.  Location of Counsel

CMA argues that its trial team practices out of Louisville only blocks from the federal courthouse, rendering venue in Kentucky more favorable.  Counsel for the other defendants and

---

[15] Furthermore, although no information has been submitted to the Court on this point, the Court imagines that lodging prices in Cincinnati and Louisville are comparable.

for the Government will be required to travel regardless of venue.  The Government argues that CMA's counsel's firm has an office location in Cincinnati, so this factor does not favor transfer.

Although the Court recognizes the inconvenience of CMA's counsel having to work out of a city that is not typically their home base, the Court finds that the availability of office space in Cincinnati cuts against CMA's argument.  The Court finds that this factor, then, does not favor transfer.

### 8.   Relative Accessibility of the Place of Trial

CMA argues that Louisville is more accessible to it than Cincinnati, and equally as accessible for the other parties involved.  The Government argues that Cincinnati is easily accessible to all parties.  The Court agrees with the Government that Cincinnati is easily accessible to all parties and is, like Louisville, drivable from CMA's headquarters.  This factor does not favor transfer.

### 9.   Docket Conditions of Each District

CMA concedes that this favor mitigates against transfer, as according to the Federal Court Management Statistics from the Office of Court Administration, the Southern District of Ohio's average for resolving criminal felony cases is five months shorter than that of the Western District of Kentucky.  Thus, this factor does not favor transfer.

### 10. Other Special Elements

Neither party argues any other special elements need be considered by the Court.

In consideration of all ten *Platt* factors, the Court finds that transfer is not warranted. Accordingly, CMA's Motion to Transfer Venue is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth herein, the Court **DENIES** both Defendant Maruyasu's Motion to Dismiss the Indictment for Lack of Personal Jurisdiction (Doc. 48) and Defendant CMA's Motion to Transfer Venue.  (Doc. 47.)

IT IS SO ORDERED.


S/Susan J. Dlott
Judge Susan J. Dlott
United States District Court